**IN RE Petition for DISCIPLINARY ACTION AGAINST Randall D.B. TIGUE,**

a **Minnesota Attorney, Registration No. 0110000.**

**A16-0694**

Supreme Court of Minnesota.

Filed: August 16, 2017

Susan M. Humiston, Director, Megan Engelhardt, Senior Assistant Director, Office of Lawyers Professional Responsibility, Saint Paul, Minnesota, for petitioner.

Randall D.B. Tigue, Fridley, Minnesota, pro se.

## OPINION

PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility (Director) filed a petition for disciplinary action against respondent Randall D.B. Tigue. The Director alleged that Tigue negligently and intentionally misappropriated client funds. We appointed a referee, who concluded that Tigue committed the alleged misconduct and recommended an indefinite suspension of at least 2 years. Tigue disputes the referee's findings of misconduct and recommended discipline. The Director disputes the referee's recommended discipline, and requests disbarment. We conclude that the referee's findings that Tigue negligently and intentionally misappropriated client funds are not clearly erroneous. We further conclude that, based on the specific facts of this case, the appropriate discipline for Tigue's misconduct is an indefinite suspension with the right to petition for reinstatement after 2 years and a permanent prohibition on being an authorized signatory on a client trust account.

## FACTS

Tigue was admitted to practice law in the State of Minnesota on October 5, 1973.[1] We publicly reprimanded Tigue in 2007 for allowing his trust account to become overdrawn, failing to promptly cure the overdraft, and failing to maintain the required trust-account books and records. *In re Tigue*, No. A07-1936, Order at 1-2 (Minn. filed Oct. 25, 2007). In 2014, we suspended Tigue for a minimum of 30 days for negligently misappropriating client funds and failing to maintain and retain the required trust account books and records. *In re Tigue*, 843 N.W.2d 583, 584-85 (Minn. 2014). We conditionally reinstated Tigue on April 28, 2014, and placed him on probation. *In re Tigue*, 845 N.W.2d 761, 762 (Minn. 2014) (order). Later that year, Tigue was admonished for failing to withdraw from representation or otherwise address a conflict of interest. We revoked Tigue's reinstatement in April 2015 for failing to file proof that he successfully passed the professional responsibility portion of the state bar examination by the deadline we established in reinstating Tigue. *In re Tigue*, No. A13-0519, Order at 2-3 (Minn. filed Apr. 15, 2015).

Finally, on May 11, 2015, we reinstated Tigue and placed him on probation until April 28, 2016, subject to the same conditions as were imposed in our April 2014 order. *See In re Tigue*, 863 N.W.2d 82, 82-83 (Minn. 2015) (order). The conditions of Tigue's probation included that he "shall abide by the Minnesota Rules of Professional Conduct"; "shall maintain law office and trust account books and records in

compliance with Minn. R. Prof. Conduct 1.15 and Appendix 1"; and shall make his trust account books and records available to the Director "at such intervals as the Director deems necessary to determine compliance." *Tigue*, 845 N.W.2d at 762.

After his reinstatement, Tigue sent his trust-account books and records to the Director on a monthly basis. In September 2015, the Director instructed Tigue to begin quarterly reporting, and asked him to send his records for October, November, and December 2015 in January 2016. When Tigue provided these trust-account books and records, the Director noted that several shortages had occurred in client trust accounts during that time. The Director issued a notice of investigation and audited Tigue's trust account, which led to this petition for disciplinary action.

The Director alleged, and the record demonstrates, that on six occasions between October 2014 and February 2016, Tigue issued payments from his trust account that caused shortages in client trust accounts.[2] The balance of Tigue's trust account was continuously short of the amount necessary to cover aggregate client balances during the periods from October 10 to November 18, 2014, and October 28, 2015 to January 19, 2016. The overall shortages ranged in amount from $43.55 to $650. Tigue made payments into his trust account to cure the shortages, and as a result, none of the clients suffered any permanent financial loss during those periods.

Tigue admitted that he caused these shortages by issuing checks without suffi-

1. Our recitation of the facts is taken from the referee's factual findings. Tigue does not contest the referee's relevant findings of fact. Instead, he asserts that his undisputed actions do not constitute misconduct.

2. The specific client trust accounts with negative balances were: B.M. ($50 shortage); business entity L., Inc. ($573.63 shortage); Y.G.

($550 shortage); R.D. ($100 shortage); S.M. ($36 shortage); M.M. ($43.55 shortage). Another shortage resulted from a $38 bank fee that was paid with client funds because Tigue did not keep a nominal amount of money in the trust account for paying bank fees. Tigue corrected the bank-fee shortage about a month after it arose.

cient client funds in the trust account to cover them. He testified that, before issuing a check, he determined the balance of funds in a client trust account by comparing· the balance for the previous month's reconciliation with the carbon copies of checks that he had issued, rather·than referring to an updated version of the client subsidiary ledger. Tigue admitted that he did not reconcile his trust-account books and records for the month of November 2015 until January 2016, despite knowing that he was required to complete monthly reconciliations.

The.Director further alleged that Tigue intentionally misappropriated funds from R.D. R.D. retained Tigue on October 14, 2015, to pursue a matter in federal court. R.D. signed a retainer agreement, which provided for "an advance retainer of $2,000.00, $400 of which will be an advance payment of the U.S. District Court filing fee." The agreement stated that Tigue would be entitled to "$250 per hour for attorney services" and that, when the retainer funds were exhausted, R.D. would "be billed on a monthly basis."

R.D. paid Tigue the $2,000 advance retainer in mid-October. Over the next 6 weeks, Tigue disbursed the entire $2,000 to himself. He drafted a complaint and sent it to R.D., but Tigue did not file a complaint in federal court. R.D. testified that he terminated the representation in

December 2015. Tigue testified that he was entitled to retain· the $400 filing fee as *quantum meruit* compensation for the services he rendered to R.D. before R.D. terminated the representation.

In August 2016, Tigue sent R.D. a check to refund the $400 filing fee. That check was returned for insufficient funds, costing R.D. a $12 fee. Shortly after the hearing before the referee in September 2016, Tigue successfully repaid the $400 with a money order.

After a hearing, the referee found that Tigue negligently misappropriated client funds and failed to promptly cure an overdraft in his trust account, in violation of Minn. R. Prof. Conduct 1.15(a), 3.4(c), and 8.4(d), and the probation conditions imposed in our April 28, 2014 order for reinstatement.[3] The referee also found that Tigue intentionally misappropriated a $400 filing fee from R.D., in violation of Minn. R. Prof. Conduct 1.15(c)(4), 1.16(d), 8.4(c), and 8.4(d), and our April 28, 2014 order.[4] Finding several aggravating factors and few mitigating factors, the referee recommended that Tigue be suspended indefinitely with the right to apply for reinstatement after 2 years.

## ANALYSIS

### I.

 When, as in this case, "a party orders a transcript of the disciplinary

---

**3.** "All funds of clients ... held by a lawyer ... in connection with a representation shall be deposited in one or more identifiable trust accounts...." Minn. R. Prof. Conduct 1.15(a). "A lawyer shall not ... knowingly disobey an obligation under the rules of a tribunal...." Minn. R. Prof. Conduct 3.4(c). "It is professional misconduct for a lawyer to ·... engage in conduct that is prejudicial to the administration of justice." Minn. R. Prof. Conduct 8.4(d).

**4.** "A lawyer shall ... promptly pay or deliver to the client ... as requested the funds ... in

the possession of the lawyer which the client ... is entitled to receive;...." Minn. R. Prof. Conduct 1.15(c)(4). "Upon the termination of representation, a lawyer shall take steps ... to protect a client's interests, such as ... refunding ·any advance payment of fees or expenses that has not been earned or incurred." Minn. R. Prof. Conduct 1.16(d). "It is professional misconduct for a lawyer to ... engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Minn. R. Prof. Conduct 8.4(c).

hearing, the referee's findings of fact and conclusions of law are not conclusive." *In re Ulanowski*, 800 N.W.2d 785, 793 (Minn. 2011). We do, however, give " 'great deference to a referee's findings and will not reverse those findings unless they are clearly erroneous.' " *In re Albrecht*, 779 N.W.2d 530, 535 (Minn. 2010) (quoting *In re Wentzell*, 656 N.W.2d 402, 406 (Minn. 2003)). The referee's findings are clearly erroneous if they are "without evidentiary support in the record." *In re Jones*, 834 N.W.2d 671, 677 (Minn. 2013).

■ Tigue challenges the referee's conclusions that he negligently misappropriated client funds. He argues that allowing shortages in his trust account was not misconduct because the shortages were caused by mathematical or clerical errors. Tigue contends that he found and corrected his errors by keeping the trust-account records required by the rules of professional conduct and reconciling his accounts as required by those rules.

■ Misappropriation of client funds occurs when " 'funds belonging to a client are not deposited in a trust account and are used for any purpose other than that specified by the client.' " *In re Lundeen*, 811 N.W.2d 602, 608 (Minn. 2012) (quoting *In re Westby*, 639 N.W.2d 358, 370 (Minn. 2002)). In this case, Tigue issued checks from his trust account on behalf of a particular client when he did not maintain sufficient amounts from that client in his trust account to cover those disbursements. As a result, funds belonging to other clients were used to cover these checks. Although these shortages were typically small and were eventually cured, they are misappropriations because funds

belonging to a client were used for purposes other than those specified by the client. *See id.*

Tigue's argument that he did not commit misconduct because he kept all trust-account books and records in the required manner is unavailing. Tigue admitted that he did not keep his client subsidiary ledgers up to date, and the record supports the referee's finding that this practice caused Tigue to make mistakes when he calculated the available funds for particular clients. Appendix 1 to the Minnesota Rules of Professional Conduct describes the trust account books and records that attorneys must keep. *See* Minn. R. Prof. Conduct 1.15(h)-(i). It states: "The following books and records must be *contemporaneously maintained* .... A subsidiary ledger for each client matter in which the attorney deposits funds into a trust account."[5] Minn. R. Prof. Conduct Appx. 1.I.3 (emphasis added). Appendix 1 also specifies that "[n]o client subsidiary ledger balance should be negative *at any time*." Minn. R. Prof. Conduct Appx. 1.I.4 (emphasis added). Tigue's negligence caused shortages in several client trust accounts, and because he failed to reconcile his trust-account records in December 2015, some shortages lasted for a total of three months. The referee's finding that Tigue negligently misappropriated client funds is not clearly erroneous.

■ Tigue argues that he did not intentionally misappropriate the $400 filing fee in the R.D. matter because he was entitled to keep it as payment, under the terms of his retainer agreement with R.D. The retainer states: "Client understands that should it hinder Attorney's representation

---

**5.** Appendix 1 further states that, for every trust account transaction, "attorneys must record on the appropriate client subsidiary ledger the date of deposit or disbursement, the amount of the transaction, the payee and

check number (for disbursements), the purpose of the transaction, and the balance of funds remaining in the account on behalf of that client matter." Minn. R. Prof. Conduct Appx. 1.I.3.a.

of Client in any way, Attorney shall immediately withdraw from representation and be entitled to *quantum meruit* [6] compensation as per the terms of this agreement."

The referee rejected Tigue's *quantum meruit* argument because Tigue's retention of the filing fee did not afford R.D. due process and did not involve any equitable determination of the value that Tigue had conferred on R.D. The Director argues, also, that the timing is wrong: Tigue disbursed the remainder of R.D.'s funds to himself on November 25, 2015, *before* R.D. had ended the representation or Tigue had withdrawn.[7]

Tigue cites two cases as support for his *quantum meruit* argument: *In re Ganley*, 549 N.W.2d 368 (Minn. 1996), and *In re French*, 864 N.W.2d 183 (Minn. 2015). In *Ganley*, the attorney kept a $120 filing fee after his client was granted *in forma pauperis* status, because he had earned it. 549 N.W.2d at 369. Ganley claimed that the client "knew or should have known" that he would keep the filing fee if *in forma pauperis* was granted. *Id.* at 370. We held that, "[a]t the very least, Ganley had a responsibility to explain to his client *exactly* what would happen to the $120 filing fee if she received IFP status. He never made any attempt to reduce the 'altered fee structure' to writing." *Id.*

In *French*, the client wrote a check to "Cover Fees for Appeal," and the parties disputed whether the payment was restricted to costs related to the appeal or included attorney fees. 864 N.W.2d at 185. French retained a cost bond from the court, which the referee found that he was entitled to keep as attorney's fees for work performed. *Id.* at 185-86. Observing that the record contained conflicting evidence, we affirmed that decision. *Id.* at 189-90.

In contrast to *Ganley* and *French*, the retainer agreement between Tigue and R.D. clearly reserved $400 for a filing fee, and the *quantum meruit* provisions did not alter that reservation. *Ganley* and *French* do not support Tigue's position. And although Tigue may have believed that he was entitled to keep the $400 filing fee under the *quantum meruit* provisions of his retainer agreement, his testimony to that effect does not render the referee's finding clearly erroneous. *See Wentzell*, 656 N.W.2d at 405 ("[W]e give great deference to a referee's findings . . . especially in cases where the referee's findings rest on disputed testimony or in part on respondent's credibility, demeanor, or sincerity."). Instead, the record shows that Tigue obtained $400 from R.D. to pay a filing fee; Tigue did not keep these funds in trust; Tigue never paid a filing fee on behalf of R.D.; and Tigue disbursed the $400 to himself. The record supports the referee's finding that Tigue intentionally misappropriated R.D.'s $400 filing fee.

**II.**

Having determined that the referee did not err in finding that Tigue committed misconduct, we now consider the appropriate discipline. The parties disagree as to the discipline that we should impose. The Director, disagreeing with the referee's

---

**6.** *Quantum meruit* is a "claim or right of action for the reasonable value of services rendered." *Quantum Meruit*, Black's Law Dictionary (10th ed. 2014).

**7.** Tigue's response to this argument is that he withdrew the filing fee, intending to transfer it to his personal account so that he could pay the filing fee by debit card as was required in federal court. Assuming that the federal court requires filing fees to be paid by debit card, the better way to safeguard client funds would be to pay the filing fee from the attorney's personal or business account with a debit card, and then use trust account funds to reimburse the attorney for that payment.

recommendation to indefinitely suspend Tigue for a minimum of 2 years, requests disbarment. Tigue argues that, if any discipline is appropriate, it should be limited to a 1-year extension of his probation.

"Although we place great weight on the referee's recommended discipline, we retain ultimate responsibility for determining the appropriate sanction." *In re Rebeau*, 787 N.W.2d 168, 173 (Minn. 2010). "The purpose of disciplinary sanctions is 'not to punish the attorney but rather to protect the public, to protect the judicial system, and to deter future misconduct by the disciplined attorney as well as by other attorneys.'" *In re Schulte*, 869 N.W.2d 674, 677 (Minn. 2015) (quoting *Rebeau*, 787 N.W.2d at 173).

In determining the appropriate sanction in an attorney discipline matter, we "consider four factors: (1) the nature of the misconduct; (2) the cumulative weight of the disciplinary violations; (3) the harm to the public; and (4) the harm to the legal profession." *In re Nelson*, 733 N.W.2d 458, 463 (Minn. 2007). Additionally, although we look to similar cases to ensure that the discipline imposed is consistent, we "impose discipline on a case-by-case basis after considering both aggravating and mitigating circumstances." *In re Plummer*, 725 N.W.2d 96, 99 (Minn. 2006). We address each of the four factors in turn, then analyze the aggravating and mitigating factors in this case, and finally examine similar cases to determine the appropriate sanction for the misconduct committed in this case.

Tigue's intentional and negligent misappropriation of client funds was serious misconduct. We have held that "misappropriation of client funds [is] a particularly serious violation." *Lundeen*, 811 N.W.2d at 608; *see In re Tigue*, 843 N.W.2d at 587 (stating that even "'unintentional misap-

propriation'" warrants severe discipline (citation omitted)). Because misappropriation is such serious misconduct, we "generally disbar attorneys who misappropriate client funds." *In re Wentzel*, 711 N.W.2d 516, 520 (Minn. 2006). When, however, the attorney shows substantial mitigating circumstances, we have imposed lengthy suspensions instead. *See, e.g.*, *In re Rooney*, 709 N.W.2d 263, 266, 272 (Minn. 2006) (suspending attorney who misappropriated funds for 18 months after noting numerous mitigating circumstances).

"Whether the presence of mitigating circumstances will allow an attorney to avoid disbarment for misappropriation depends on the severity of the misconduct and the strength of the mitigating factors." *Id.* at 272; *see also In re Grzybek*, 567 N.W.2d 259, 264 n.1 (Minn. 1997) (stating that while "the misappropriation of small amounts of money is [not] defensible, . . . the amount of the misappropriation is an appropriate consideration in determining sanctions"); *In re Bernstein*, 404 N.W.2d 804, 804-05 (Minn. 1987) (imposing a 4-year suspension on an attorney who misappropriated client funds when the case "involves an isolated instance of misappropriation of a relatively small sum of money, for a short period of time, followed by full restitution" and the attorney "is contrite" and "has shown himself to be a person of good character").

Having determined that Tigue's misconduct was serious, we next address the cumulative weight of his violations. Evaluation of this factor looks to distinguish those acts representing "'a brief lapse in judgment' or 'a single isolated incident' . . . from multiple instances . . . occurring over a substantial amount of time or involving significant amounts of money." *In re Fairbairn*, 802 N.W.2d 734, 743 (Minn. 2011) (citation omitted).

Tigue created shortages in six different client trust accounts between October 2014 and February 2016. This repeated occurrence of trust-account shortages suggests that Tigue's misconduct was not a brief lapse in judgement. On the other hand, the longest period that Tigue's trust account remained short was about 3 months, which is a relatively brief period of time. And Tigue's intentional misappropriation occurred only once, when he retained the $400 filing fee in the R.D. matter.

Next, we must determine whether, and to what extent, Tigue's misconduct harmed the public or the legal profession. *See Fairbairn*, 802 N.W.2d at 743. Tigue's misappropriation of client funds by its nature harms the public at large and the legal profession, because it betrays the trust the client places in an attorney. *See id.* In evaluating these factors, we have also considered how many clients were harmed and the extent of the clients' injuries. *In re Coleman*, 793 N.W.2d 296, 308 (Minn. 2011). In this case, Tigue's misappropriation involved relatively small amounts of money. Other than the $12 fee that R.D. was charged when Tigue's check bounced, no client was permanently deprived of money, although R.D. was denied his $400 for several months before Tigue repaid the funds that he had misappropriated.

Having addressed what harm Tigue's misconduct has caused to the public and the legal profession, we next determine what aggravating and mitigating factors impact the appropriate sanction. *See Fairbairn*, 802 N.W.2d at 742, 744. The referee found five aggravating factors.

■ First, Tigue was subject to prior discipline in 2007 and in 2014. "[A]fter being disciplined, an attorney is expected to show a 'renewed commitment' to ethical behavior." *Coleman*, 793 N.W.2d at 308 (quoting *In re Milloy*, 571 N.W.2d 39, 45-46 (Minn. 1997)). This aggravating factor

weighs heavily because the prior discipline was for similar misconduct. *See In re Cutting*, 671 N.W.2d 173, 175 (Minn. 2003) (holding that similar prior misconduct weighs more heavily in later discipline proceedings for the same attorney).

Second, the referee found as an aggravating factor that Tigue committed misconduct while on probation. *See In re Garcia*, 792 N.W.2d 434, 443 (Minn. 2010) (holding that committing misconduct while on probation aggravates the misconduct). Third, the referee found that Tigue failed to "recognize that his actions and inactions constitute potential misconduct" and lacked remorse, aggravating his misconduct. *See Wentzel*, 711 N.W.2d at 522 (citing lack of insight into the nature of the misconduct as an aggravating factor). The record supports these aggravating factors.

Fourth, the referee found that the 10-month delay in returning R.D.'s filing fee and the permanent loss of $12 from the bounced-check fee that R.D. paid aggravated the conduct. While this conclusion is supported by the record, it should not be weighed as an aggravating factor because it duplicates the above consideration of the harm caused to Tigue's clients. *See In re Fru*, 829 N.W.2d 379, 390 n.7 (Minn. 2013) (refusing to consider the attorney's multiple acts of misconduct over an extended period of time as an aggravating factor because that factor "overlap[ped] with our consideration of the cumulative weight of [the attorney's] disciplinary violations").

Finally, the referee found that Tigue "has substantial experience in the practice of law." Tigue has practiced law for over 40 years. Committing misconduct despite this substantial experience is an aggravating factor. *See Schulte*, 869 N.W.2d at 679.

The referee concluded that four factors mitigated Tigue's misconduct, but that

they were "not entitled to great weight": (1) Tigue offered before the present petition to submit his trust-account books and records more frequently than requested by the Director;[8] (2) Tigue substantially complied with his probation before the present misconduct occurred; (3) Tigue made substantial but untimely and incomplete restitution to R.D.; and (4) Tigue corrected the trust account shortages for all clients other than R.D. without permanent financial loss to them.

■■■ At least two of these mitigating factors, however, are legally improper. "Compliance with the law is no mitigating factor," *In re Grigsby*, 764 N.W.2d 54, 61 (Minn. 2009), nor is compliance with the rules of professional conduct, *Albrecht*, 779 N.W.2d at 539. As a result, Tigue's substantial compliance with the terms of his disciplinary probation before committing the current misconduct is not a mitigating factor.

The referee further relied on the lack of harm to clients when he found that Tigue's payment to R.D. and the lack of permanent financial loss to Tigue's other clients were mitigating factors. We have held that a lack of harm to clients may be considered a mitigating factor. *In re Glasser*, 831 N.W.2d 644, 649 (Minn. 2013); *see Fairbairn*, 802 N.W.2d at 747 (determining that when an attorney's misappropriation of client trust funds does not cause a client to suffer "any prejudice or damage," the attorney is entitled to mitigation). In a decision filed after oral argument in this case, however, we clarified that lack of harm to clients should not be considered a separate mitigating factor because we have already considered any harm to clients

when assessing the harm that the attorney's misconduct caused the public and the legal profession. *See In re Bonner*, 896 N.W.2d 98, 110 (Minn. 2017). As a result, although any harm to Tigue's clients is a relevant consideration when determining the appropriate discipline, lack of harm to clients is not a separate mitigating factor.

Finally, we look to similar cases to ensure consistency in our disciplinary decisions. *In re Nathanson*, 812 N.W.2d 70, 80 (Minn. 2012). We recently noted that in "a few instances [we have] imposed discipline less than disbarment in a misappropriation case when the record does not reveal substantial mitigating factors." *In re Matson*, 889 N.W.2d 17, 26 (Minn. 2017); *see In re Trimble*, 822 N.W.2d 291, 291-92 (Minn. 2012) (order) (imposing an indefinite suspension for a minimum of 2 years on an attorney who misappropriated advance expenses from a client, neglected and failed to communicate with a client, failed to appear in court, and failed to cooperate with the Director's investigation); *In re Brooks*, 696 N.W.2d 84, 88-89 (Minn. 2005). For example, in *Brooks*, we sanctioned an attorney for neglecting two clients, failing to maintain trust-account books and records, converting a $200 filing fee to her own use, and failing to cooperate with the disciplinary process. *Id.* at 86-87. Brooks had been disciplined on five prior occasions, three of which involved similar misconduct. *Id.* at 87. Some evidence suggested mitigating factors may have been present, namely that the attorney's father had died and she was out of state assisting her mother. *Id.* at 87-88. Noting that Brooks appeared to have abandoned her legal practice entirely, we

---

8. In a letter to the Director near the beginning of his probation, Tigue stated that he would prevent trust account shortages "by submitting my reports on a monthly basis, regardless of your letter requiring them to be

done quarterly." Tigue submitted his records to the Director on a monthly basis until the Director requested quarterly reporting in September 2015.

imposed an indefinite suspension with no right to petition for reinstatement for 2 years. *Id.* at 89.

The referee also cited *In re Hanvik,* 609 N.W.2d 235 (Minn. 2000). In *Hanvik,* we indefinitely suspended an attorney with no right to petition for reinstatement for 2 years for misappropriating less than $5,000 in two client matters, making false statements to the Director, clients, and Medicare, failing to respond to a client, failing to maintain trust account records or client ledgers, and providing an incomplete and inaccurate trust-account ledger to the Director. *Id.* at 236-41. We identified two mitigating factors: Hanvik made restitution of funds to nearly all affected clients and did not have a prior disciplinary history.[9] *Id.* at 239, 241. The referee also concluded that Hanvik's false statements to an investigator, to the Director, and to Medicare while under investigation were aggravating factors. *Id.* at 239. Based on these conclusions, we imposed a 2-year suspension. *Id.* at 242.

These cases are fair comparisons to Tigue's case. Like Brooks and Trimble, Tigue intentionally misappropriated a single filing fee. And like in *Brooks,* Tigue's disciplinary history aggravated his misconduct. Brooks and Trimble committed more types of misconduct than Tigue, however, including neglecting clients and failing to cooperate with the Director. *Hanvik* is also similar to Tigue's case. Tigue's misconduct involved more aggravating factors, especially because Hanvik had no prior discipline, but Tigue's misconduct was also less serious than Hanvik's misconduct, which involved misappropriation of more funds, false statements to clients, the Di-

rector, and Medicare, and submitting false documents to the Director.

We recognize that misappropriation " 'is particularly serious misconduct and usually warrants disbarment absent clear and convincing evidence of substantial mitigating factors.' " *Garcia,* 792 N.W.2d at 443 (quoting *In re Rhodes,* 740 N.W.2d 574, 579 (Minn. 2007)). Although we have often disbarred attorneys for misappropriating funds because of the critical need for public trust in the legal profession, we do not believe that disbarment is the appropriate discipline here. Balancing the nature and extent of Tigue's misconduct—which involved a single incident of intentional misappropriation involving a relatively small amount of money, eventual repayment to that client and lack of harm to any other client—and the aggravating factors and the mitigating factors present, we hold that an indefinite suspension with the right to petition for reinstatement after 2 years is the appropriate discipline. We are confident that this lengthy indefinite suspension will adequately protect the public, particularly when combined with the *permanent* prohibition on Tigue serving as an authorized signer on a client trust account should he be reinstated in the future.

Accordingly, we order that:

1. Respondent Randall D.B. Tigue is indefinitely suspended from the practice of law, effective 14 days from the date of this opinion, with no right to petition for reinstatement for a period of 2 years.

2. Tigue may petition for reinstatement under Rule 18(a)-(d), Rules on Lawyers Professional Responsibility (RLPR). Reinstatement is conditioned on successful completion of the written examination required for admission to the practice of law

---

9. Neither one of these is a mitigating factor under our current disciplinary case law. *See Bonner,* 896 N.W.2d at 110 (concluding that lack of harm to clients should not be considered a separate mitigating factor); *Rebeau,* 787 N.W.2d at 176 ("An attorney's lack of disciplinary history is not a mitigating factor.").

by the State Board of Law Examiners on the subject of professional responsibility and satisfaction of continuing legal education requirements. *See* Rule 18(e)-(f), RLPR.

3. Tigue is permanently prohibited from being an authorized signatory on a client trust account.

4. Tigue shall comply with Rule 26, RLPR (requiring notice of suspension to clients, opposing counsel, and tribunals), and shall pay $900 in costs, *see* Rule 24(a), RLPR.

## CONCURRENCE & DISSENT

STRAS, Justice (concurring in part, dissenting in part).

I would disbar Randall D.B. Tigue. Our cases are clear that when attorneys intentionally misappropriate client funds, no matter the amount of money involved, we disbar them, not indefinitely suspend them. *See, e.g., In re Rodriguez*, 783 N.W.2d 170, 170 (Minn. 2010) (order) (disbarring an attorney who misappropriated $650 and misrepresented the terms of agreements signed by his clients); *In re Grzybek*, 567 N.W.2d 259, 259-60, 265 (Minn. 1997) (disbarring an attorney who misappropriated $750, among other misconduct). I believe that such a sanction is particularly appropriate here, in light of our mandate to protect the public, because Tigue does not recognize the wrongfulness of his misconduct and continues to minimize it. We have the final say over the discipline imposed, and it is our responsibility to exercise our authority to enforce what is explicit in our case law: we disbar attorneys who steal money from a client absent the presence of *substantial* mitigating factors. Accordingly, I respectfully dissent from the court's decision to impose a sanction other than disbarment.

In this case, Tigue accepted $400 from a client that a retainer agreement specifically allocated for the "advance payment of [a] U.S. District Court filing fee." It was part of "an advance retainer of $2,000.00" for Tigue to represent the client in connection with an alleged deprivation of his civil rights arising out of the denial of a conditional-use-permit application. Rather than using the $400 for the filing fee, as the retainer agreement provided, Tigue transferred the entire retainer amount, including the $400 designated for filing fees, to himself, without filing a complaint or any other pleading in federal court. In fact, Tigue made the conscious decision to keep the $400 as attorney fees *before* the client terminated the representation, later claiming that the client owed him the fees under a *quantum meruit* theory. Regardless of whether Tigue believes that he is entitled to the $400—and based on his representations at oral argument he clearly still does—misappropriation occurs whenever client funds are used for *any* purpose other than the one specified by the client. *In re Ulanowski*, 834 N.W.2d 697, 701 (Minn. 2013) ("'An attorney misappropriates client funds whenever the funds are not kept in trust and are used for a purpose other than one specified by the client.'" (quoting *In re Brooks*, 696 N.W.2d 84, 88 (Minn. 2005))). Given that the written retainer agreement specifically earmarked the $400 for payment of a filing fee, not for attorney fees, Tigue intentionally misappropriated funds from his client when he kept the $400 for himself.

Moreover, Tigue's intentional misappropriation of client funds is only a part of a larger pattern of financial misconduct. *In re Moeller*, 582 N.W.2d 554, 560 (Minn. 1998) ("[T]his court will impose disbarment 'when there is a continuing pattern ... of

misconduct which constitute[s] a great danger from which the public needs immediate protection.'" (quoting *In re Carey*, 380 N.W.2d 806, 809 (Minn. 1986))). In 2007, we publicly reprimanded Tigue and placed him on probation for, among other things, a shortage in his trust account and for failing to maintain trust-account books and records. *In re Tigue*, No. A07-1936, Order at 1-2 (Minn. filed Oct. 25, 2007). In 2014, we once again disciplined Tigue for financial misconduct, suspending him for negligently misappropriating client funds and failing to maintain trust-account books and records. *In re Tigue*, 843 N.W.2d 583, 584, 589 (Minn. 2014). And with respect to the current disciplinary petition, in addition to the intentional misappropriation, the referee found that Tigue committed at least six acts of negligent misappropriation and failed to maintain trust-account books and records for part of the period covered by the petition. Yet when we asked Tigue at oral argument what he would do differently going forward, he not only indicated that he had done nothing wrong, but also that he did not need to make any changes in how he handled client funds. Tigue's response was not only startling, it is dangerous.

Even though the referee recommended only a 2-year suspension in this case—a sanction that the court adopts today—the referee's findings recognize the danger that Tigue poses to the public. Among the aggravating factors found by the referee were a "history of prior discipline," "substantial experience in the practice of law," and Tigue's decision to return the filing fee only after the petition for disciplinary action had been filed against him. In addition, the referee noted that Tigue "committed his current misconduct while on probation," which we have said "suggests that a more serious sanction may be needed to prevent such misconduct from recurring," *In re Albrecht*, 779 N.W.2d 530, 537

(Minn. 2010). And most importantly, the referee found that Tigue "does not recognize that his actions and inactions constitute professional misconduct" and "therefore does not have, and has not expressed, any remorse for his misconduct."

To counterbalance the presence of aggravating factors, the referee found only four mitigating factors, but recognized that none was entitled "to great weight." The court correctly concludes that two of the mitigating factors—compliance with probationary conditions and correcting trust-account shortages—were "legally improper" forms of mitigation. The two mitigating factors that remained—what I would call "mitigation light"—included paying untimely restitution to the client and offering to submit financial records to the Director more frequently than our probationary order required. The two remaining mitigating factors are certainly not of such a substantial nature that they are analogous to those present in either *Fairbairn* or *Rooney*, two other intentional-misappropriation cases in which we imposed a sanction short of disbarment. *See In re Fairbairn*, 802 N.W.2d 734, 745-47 (Minn. 2011) (imposing an 18-month suspension based on the presence of *substantial* mitigating factors, including remorse, restitution, lack of harm to clients, and extraordinary personal stress); *In re Rooney*, 709 N.W.2d 263, 271-73 (Minn. 2006) (imposing an 18-month suspension based on "numerous" *substantial* mitigating factors, including sincere remorse, full restitution, significant contributions to the community, extraordinary personal stress, and lack of a prior disciplinary history).

To summarize, Tigue intentionally misappropriated client funds that a written retainer agreement assigned for a particular purpose, negligently misappropriated client funds through sloppy accounting practices, and has a history of financial

misconduct. The referee found multiple aggravating factors and, at most, two legitimate mitigating factors, neither of which is substantial. Under these circumstances, our case law yields only one answer to the appropriate sanction for the misconduct: disbarment. *See, e.g., In re Rambow*, 874 N.W.2d 773, 778 (Minn. 2016) ("The presumptive discipline for intentional misappropriation of client funds is disbarment, unless there is clear and convincing evidence of *substantial* mitigating factors." (emphasis added)); *In re Jones*, 834 N.W.2d 671, 681 (Minn. 2013) ("The presumptive punishment for misappropriation of client funds is disbarment."). In fact, we know that the 2-year suspension imposed by the court is unlikely to deter future misconduct by Tigue for two reasons: (1) we have suspended Tigue before and he still committed financial misconduct during the probationary period following his suspension; and (2) he does not believe that he has committed any misconduct at all. If we are to adequately protect the public, which is our mandate in attorney-discipline cases, disbarment is the only sensible option. *See In re Grigsby*, 815 N.W.2d 836, 846 (Minn. 2012) ("The purpose of any disciplinary proceeding, as noted earlier, is to protect the public . . . .").

In reaching a different conclusion, the court relies on *In re Brooks*, 696 N.W.2d 84 (Minn. 2005), which it says supports the referee's recommended 2-year indefinite suspension. To be sure, the fact pattern in *Brooks* appears at first glance to be similar to the facts of this case; both Brooks and Tigue converted funds earmarked for a filing fee into attorney fees, and both largely replicated their previous misconduct. *See id.* at 87. But the similarities end there. Unlike *Brooks*, Tigue has demonstrated a pattern of escalating misconduct, from failing to keep trust-account books and records to negligent misappropriation, eventually culminating in the commission

of intentional misappropriation, the most serious type of financial misconduct. Despite facing public discipline twice before, Tigue's conduct has become more, not less, serious.

Further, unlike in this case, it is not clear to what extent the unique facts in *Brooks* motivated our decision. We recognized in *Brooks* that, although the record was not sufficient to make an explicit finding on what appeared to be a substantial mitigating factor, the death of a family member might have mitigated Brooks's misconduct. *Id.* at 89. Moreover, *Brooks* involved one critical fact that is indisputably absent here: "Brooks ha[d] abandoned her legal practice and ha[d] not practiced law in more than a year," *id. See also In re Pyles*, 421 N.W.2d 321, 322-23, 327 (Minn. 1988) (suspending rather than disbarring an attorney because, even though the attorney misappropriated client funds, he was no longer engaged in the practice of law). This fact stands in stark contrast to Tigue, who has continued to practice law and has given us every indication that he will resume his practice if we reinstate him after his suspension.

All of this brings us back to the critical question here: will a 2-year suspension adequately protect the public? In *Brooks*, it was possible to answer that question "yes." But here it is not, in light of Tigue's uninterrupted practice of law and his disturbing lack of insight into the nature and seriousness of his misconduct. I also cannot help but wonder whether this case may signal a retreat from our longstanding presumption that intentional misappropriation warrants disbarment. After all, not only are there no substantial mitigating factors, but there were also numerous aggravating factors found by the referee. Under these circumstances, I respectfully dissent from the court's decision to suspend Tigue rather than disbar him.

MCKEIG, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Stras.