STATE OF MINNESOTA

IN SUPREME COURT

A22-0299

Original Jurisdiction

PER CURIAM
Took no part, Moore, III, Procaccini, JJ.

In re Petition for Disciplinary Action
Against David L. Ludescher, a Minnesota
Attorney, Registration No. 194347

Filed: December 6, 2023
Office of Appellate Courts

————————————

Susan M. Humiston, Director, Binh T. Tuong, Deputy Director, Office of Lawyers Professional Responsibility, Saint Paul, Minnesota, for petitioner.

Jessica L. Klander, Aram V. Desteian, James C. Kovacs, Gillian L. Gilbert, Bassford Remele, P.A., Minneapolis, Minnesota, for respondent.

————————————

S Y L L A B U S

1.      The attorney discipline referee did not err by concluding that the juvenile court's orders purporting to grant the attorney's client temporary custody (both physical and legal) of the client's child were unenforceable.

2.      The attorney discipline referee did not err by concluding that the transaction set-aside provision in Minnesota Statutes section 524.5-417(e) (2022) did not apply to the termination of the attorney's on-going attorney-client relationship with a client who became subject to a conservatorship.

3.      The attorney discipline referee did not misinterpret Minnesota Rule of Professional Conduct 1.6 by determining that the attorney violated the rules of professional misconduct when the attorney failed to disclose his incapacitated client's file to the conservator.

4.      Suspension from the practice of law for a minimum of 60 days followed by a 2-year term of supervised probation is the appropriate discipline for this attorney's misconduct.

Suspended.

O P I N I O N

PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility petitioned for disciplinary action against respondent-attorney David L. Ludescher, alleging professional misconduct in two client matters.  We appointed a referee, who, after conducting an evidentiary hearing, found that the Director had proved by clear and convincing evidence that Ludescher committed misconduct including (1) incompetent representation, (2) bringing frivolous claims, (3) making knowingly false statements, (4) acting to embarrass or burden a third person, (4) failing to reasonably protect a client's interest upon termination, (5) engaging in conduct prejudicial to the administration of justice, (6) charging or collecting an unreasonable fee, and (7) failing to withdraw representation upon termination.  The referee also found five aggravating factors and no mitigating factors.  The referee recommended that Ludescher be suspended from the practice of law for 30 days.

Ludescher contends that the referee misinterpreted relevant law and the Rules of Professional Conduct and failed to adequately consider the record when making certain findings and conclusions. The Director defends the referee's reasoning and findings but argues that the referee's disciplinary recommendation is insufficient given the seriousness of Ludescher's misconduct. We agree with the referee's legal conclusions and conclude that the referee's findings were not clearly erroneous. Consequently, the referee's rule-violation conclusions are supported. We also conclude that the appropriate discipline is a 60-day suspension from the practice of law followed by a 2-year term of supervised probation.

**FACTS**

Ludescher was admitted to practice law in Minnesota in 1988, began practicing in child protection matters in 1989, and began working on guardianship and conservatorship cases in 2000. The petition for disciplinary action arises from Ludescher's conduct in two client matters: the J.K. matter, involving a child protection case, and the G.N. matter, involving a guardianship/conservatorship case. We review the facts of each matter in turn.

*J.K. Matter*

J.K. is the father of a child who was the subject of a child in need of protection or services (CHIPS) petition filed by the Rice County Attorney's Office in September 2017. Though not married, J.K. and the child's mother lived together with the child, and J.K. signed a recognition of parentage and the child's birth certificate. The child's mother had sole physical and legal custody of the child because she was not married when the child was born. *See* Minn. Stat. § 257.541, subd. 1 (2022). J.K. could have petitioned for

3

custody of the child, *see id.*, subd. 2(b) (2022), but J.K. had not petitioned for custody before the CHIPS matter commenced. Consequently, J.K. did not have custodial rights to the child, and he was initially listed only as a participant, rather than a party, in the CHIPS proceedings. J.K. retained Ludescher to represent him in the CHIPS matter, and Ludescher understood that J.K. did not have custodial rights.

Ludescher understood that a parent labeled as a participant to a CHIPS matter does not have legal custody over the child subject to the CHIPS petition, and also understood that a non-custodial parent could not be granted legal custody of a child because the CHIPS disposition statute only permits legal custody to be transferred to a child-placing or social services agency. Ludescher simultaneously understood that J.K. was labeled as a participant and did not have custodial rights to P.K. *See* Minn. Stat. § 260C.201, subd. 1(a)(1)(i) (2022). Ludescher understood that when a court places a child with a non-custodial father, the court can only transfer legal custody of the child to a child-placing agency, or to the responsible social services agency. *See id.*, subd. 1(a)(2) (2022).

Despite this legal framework, the juvenile court issued an order that included language purporting to grant J.K. "temporary physical and legal custody" of the child subject to Rice County Social Services' (the agency's) protective supervision. This language became a part of the template orders used throughout the CHIPS proceedings.

Ludescher understood that while a CHIPS proceeding is ongoing, the juvenile court has exclusive jurisdiction over custody of the child. *See also* Minn. Stat. § 260C.101, subd. 1 (2022). Nevertheless, Ludescher initiated a separate paternity and custody action

4

for J.K. in family court.[1]  Ludescher also filed a motion to dismiss the CHIPS petition as it related to J.K.'s child. In support of the motion, Ludescher argued that J.K. had been granted temporary legal custody, was a fit parent, and had filed for permanent custody.  He also contended that *Troxel v. Granville*, 530 U.S. 57 (2000),[2] prevented the county from interfering with J.K.'s rights as a parent.  The juvenile court denied this motion to dismiss because J.K. had no custodial rights to the child other than the temporary rights given to him in the CHIPS proceedings and because the purpose of the CHIPS proceedings was to reunify the child with its mother, the custodial parent.

After a 2-day court trial, the juvenile court issued an order on December 12, 2017, adjudicating the child as CHIPS and reiterating that J.K. only had temporary custody and that the mother would have sole custody of the child absent the CHIPS proceedings. Ludescher moved for a new trial, again citing *Troxel*, and requested that the juvenile court conclude J.K. was a custodial parent.  The juvenile court denied this motion on January 19, 2018, reiterating that the child would return to the mother's custody absent the CHIPS proceedings, that custody motions were not permitted because it had continuing and exclusive jurisdiction over the child's custody, and that the remainder of Ludescher's

---

[1]     The family court did not take any action on this filing.

[2]     *Troxel v. Granville* did not control here.  In *Troxel*, the United States Supreme Court held in a plurality opinion that the application of a statute that authorized state courts to award visitation rights to a non-parent "whenever 'visitation may serve the best interest of the child' " violated a custodial parent's due process right to make decisions concerning the care, custody, and control of their children.  530 U.S. 57, 60, 75 (2000).  *Troxel* differs vastly from J.K.'s circumstances given that J.K. is not and has never been a custodial parent.

arguments had already been addressed by the court. The court also repeatedly advised Ludescher during hearings that reunification would only occur with the mother, that J.K. lacked custodial rights, and that the juvenile court had exclusive jurisdiction over custody decisions.[3]

Despite his understanding of the controlling CHIPS statutes and the juvenile court's orders, Ludescher continuously argued throughout the CHIPS proceedings that J.K. had custody of the child. On March 15, 2018, the juvenile court issued an order authorizing the agency to begin a trial home visit with the mother when she obtained safe housing. On April 3, 2018, Assistant Rice County Attorney Jennifer Nelson moved to increase the mother's visitation. The juvenile court granted this motion on April 11, 2018, reiterating that the mother was the only custodial parent in the case and the agency was therefore obligated to reunite the mother and the child.

On May 1, 2018, the agency commenced a trial home visit with the mother and the child. Nelson sent Ludescher a letter explaining that the agency placed the child on a trial home visit, so J.K. no longer had temporary custody. Up until this point, Nelson had not

---

[3] Ludescher appealed the December 12 and January 19 order to the court of appeals in January 2018, and the court of appeals issued its nonprecedential opinion in May 2018. *See In re Welfare of Children of S.E.M.*, A18-0177, 2018 WL 2407268 (Minn. App. May 29, 2018). The court of appeals upheld the adjudication, concluded that the juvenile court's original and exclusive jurisdiction precluded a family court from issuing a custody determination during the CHIPS proceedings, and found no persuasive reason to overturn the court's dispositional orders. *Id.* at *4, 6–7. The court of appeals also stated in a footnote that even though the juvenile "court ordered that the child 'remain in the temporary physical and legal custody of father,' " Rice County Social Service, "not a noncustodial parent, has legal responsibility for a child 'taken into custody' and placed with a noncustodial parent under the CHIPS statute." *Id.* at *1, n.2.

6

fully realized there was language granting J.K. "temporary legal and physical custody," and the juvenile court did not understand this language to be the basis for Ludescher's repeated custody arguments. Nelson understood Ludescher's custody arguments to be based on J.K. being the child's custodian, and the juvenile court understood Ludescher's custody arguments to be based on the signed recognition of parentage and the child's living arrangement with J.K. Ludescher never informed Nelson or the juvenile court of the legally erroneous language granting J.K. temporary legal custody.

After receiving the May 1, 2018, letter from Nelson, Ludescher repeatedly called and e-mailed Nelson, attempting to bully and threaten her into returning the child to J.K. Nelson testified that Ludescher repeatedly yelled at her throughout the case, threatened to trespass the agency from J.K.'s property, and once "was so upset and agitated that [Ludescher] put his hands on the male guardian ad litem." Ludescher e-mailed the Rice County Attorney and the county sheriff a letter in which he claimed that Nelson may have engaged in criminal intentional deprivation of parental rights by helping the mother take the child from J.K. In the letter, Ludescher alleged that J.K. had court-ordered temporary legal and physical custody, and sole custody of the child. Ludescher failed to mention that custody would revert back to the mother if the CHIPS proceedings were dismissed because J.K. had no custodial rights, or that the court had authorized a trial home visit with the mother. As a result of Ludescher's e-mail, Nelson was questioned by the sheriff and a criminal investigation was commenced by the Le Sueur County Sheriff to avoid any conflicts of interest.

7

On May 4, 2018, Ludescher moved the juvenile court for ex parte relief, seeking to have custody of the child returned to J.K. On May 7, 2018, the court denied the motion, recognizing that the prior orders purporting to grant temporary legal custody of the child to J.K. were unenforceable given the CHIPS statutes, and scheduled a hearing for May 10, 2018. At the hearing, Ludescher again accused Nelson of a crime and read her a *Miranda*-esque warning on the record.[4] Ludescher also argued that J.K. had custody based on the temporary custody granted in prior CHIPS orders. On June 25, 2018, upon a motion from Nelson, the juvenile court sanctioned Ludescher and ordered him to cease and desist his custody arguments.

*G.N. Matter*

G.N. retained Ludescher in early 2017 for representation in the litigation of G.N.'s father's estate (estate case). On December 14, 2017, G.N. was committed as mentally ill to the Commissioner of Human Services and North Memorial Health Hospital for an initial period of 6 months, which was later extended for another 12 months.

---

[4]    Though Ludescher denied making these statements at the evidentiary hearing, the referee found that the transcript of the May 10, 2018, hearing included the following statements from Ludescher:

> Your Honor, before we get started, I don't know if it's appropriate that we continue forward. I have made a complaint to the Rice County Sheriff's Office asking the Rice County Sheriff to investigate intentional deprivation of parental rights. They have agreed to do so . . . I would advise the parties that anything they say can and could be used against them. They have a right not to testify or not to say anything, and their Fifth Amendment rights are implicated if, in fact, there is a criminal investigation and the matter moves forward.

On March 2, 2018, Ludescher filed a certificate of representation on G.N.'s behalf in the estate case. In late March, the court appointed Stephen Ecker to serve as G.N.'s attorney in proceedings regarding a guardianship and conservatorship (guardianship/conservatorship case) and appointed Alternative Resolutions, Inc. (ARI) as G.N.'s emergency guardian and conservator. ARI's appointments became permanent in June 2018.

J. Scott Braden represented ARI in the guardianship/conservatorship case. The letters of guardianship and conservatorship granted ARI full powers and authority, including those in Minn. Stat. §§ 524.5-313(c), 524.5-417(c) (2022). Those powers included the powers to represent G.N. in any court proceedings, and to approve or withhold approval of any contract, except for necessities, that G.N. wanted to make. *See* Minn. Stat. § 524.5-417(c).

On July 12, 2018, Braden, on ARI's behalf, terminated Ludescher's representation of G.N. in the estate case and requested Ludescher's files on G.N. Ludescher still continued to provide G.N. legal services and to bill him for those services at a rate of $200 per hour. On August 3, 2018, Braden sent another letter, again requesting G.N.'s file and an invoice for services. Because Ludescher had sent ARI a bill, Braden testified that ARI needed the invoices to do its fiduciary duty to verify Ludescher's fees before paying Ludescher's bill.

Ludescher did not provide the file or invoices. On August 10, 2018, Ludescher requested the documentation that established ARI as G.N.'s guardian and conservator. Braden sent Ludescher the requested documentation on August 15, 2018, explained that

9

ARI had full contract authority with no restrictions, reminded Ludescher that ARI terminated Ludescher's contract with G.N. on July 12, 2018, and again requested G.N.'s file. Ludescher did not provide the file.

At a hearing in the estate case on August 17, 2018, Ludescher appeared and contested his discharge. The probate court took the issue under advisement and gave Ludescher the opportunity to file a brief; Ludescher did not do so. On September 4, 2018, the probate court issued an ex parte order, finding that ARI was G.N.'s substitute decision maker in the estate case, and that Braden was the proper attorney of record for service of process on G.N. Ludescher did not file a withdrawal of representation in the estate case. The probate court issued another order on November 15, 2018, finding that Ludescher had not been G.N.'s attorney of record in the estate case since July 2018.

Despite these orders from the probate court, Ludescher did not produce G.N.'s file and continued to consult with and bill G.N. A trial in the estate matter was scheduled for February 2019 and Braden and ARI still did not have G.N.'s file, both of which they believed were necessary to represent G.N.'s best interests at the trial, so Braden filed an ex parte motion seeking an order requiring Ludescher to release his complete file on G.N. The probate court granted this motion and ordered Ludescher to release G.N.'s file within 48 hours, including all e-mails, correspondence, pleadings, records, and invoices. Ludescher partially complied, sending the file without any invoices—Ludescher claimed that G.N. did not want him to disclose the invoices.

On April 5, 2019, while G.N. was still incapacitated, Ludescher filed a claim in conciliation court against G.N. seeking $8,372.10 for legal services provided from

10

February 2018 through April 2019. Ludescher filed this conciliation claim even though ARI was willing to pay Ludescher's legal fees if the invoices supported Ludescher's billing and G.N. had the financial resources.

On August 30, 2019, at a conciliation hearing, Ludescher told the conciliation court that he and G.N. had reached a settlement agreement wherein G.N. would pay $5,000. ARI, as G.N.'s guardian and conservator, disputed the validity of this agreement given G.N.'s lack of capacity, and ARI again requested Ludescher's retainer agreement and itemized invoices. Ludescher was, again, ordered to produce his retainer agreement and itemized invoices by September 30, 2019. Ludescher again did not comply.

On October 16, 2019, the probate court terminated G.N.'s guardianship and conservatorship. On October 28, 2019, Ludescher requested, and the conciliation court granted, dismissal of the conciliation claim because G.N., now restored to capacity, would voluntarily pay Ludescher.

The invoices, obtained in this disciplinary process, show that Ludescher charged G.N. $3,160 in legal fees and $165.85 in total expenses between July 12, 2018 (the date ARI terminated Ludescher's representation) and October 19, 2019 (when G.N. was restored to capacity). These charges included fees associated with the conciliation action Ludescher filed against G.N.

*Disciplinary Proceedings*

The Director received complaints about Ludescher's conduct in July and August 2018 (in the J.K. matter), and September 2019 (in the G.N. matter), and opened an investigation. On March 3, 2022, the Director petitioned for disciplinary action against

11

Ludescher based on his alleged misconduct in both the J.K. and G.N. matters. The Director alleged the following rule violations: (1) Ludescher's repeated arguments that J.K. had custody of the child violated Minn. R. Prof. Conduct 1.1 and 3.1; (2) Ludescher's allegations of criminal activity against Nelson and knowingly false statement that J.K. had sole temporary legal and physical custody violated Minn. R. Prof. Conduct 4.1 and 4.4(a); (3) Ludescher's suit against G.N., an incapacitated client, for attorney's fees when ARI was willing to pay the fees violated Minn. R. Prof. Conduct 1.1, 3.1, and 8.4(d); (4) Ludescher's refusal to provide G.N.'s file upon termination and request, refusal to produce invoices to the conservator, and simultaneous demand for payment of said invoices violated Minn. R. Prof. Conduct 1.16(d) and 8.4(d); and (5) Ludescher's choice to continue representing and billing G.N. without court authorization after Ludescher's services were terminated violated Minn. R. Prof. Conduct 1.5(a), 1.16(a)(3), and 8.4(d).

After Ludescher answered the petition, we appointed a referee who held a 3-day evidentiary hearing at which the parties submitted a collective 114 exhibits and presented testimony from Rice County District Court Judge Long, Jennifer Nelson, Carrie Doom (Director's child protection expert), J. Scott Braden, Ludescher, J.K., Patricia Zenner (Ludescher's child protection expert), and Jill Sauber (Ludescher's guardianship/conservatorship expert).

The referee concluded the following: (1) Ludescher's custody arguments in the J.K. matter "had no support in fact and law and showed a lack of thoroughness, preparedness and legal skill in representing a client," violating Minn. R. Prof. Conduct 1.1 and 3.1; (2) Ludescher made "a knowingly false statement" by claiming that Nelson deprived J.K.

of parental rights and helped abduct J.K.'s child, violating Minn. R. Prof. Conduct 4.1; (3) Ludescher's claims that Nelson committed a crime "had no purpose other than to embarrass" Nelson, violating Minn. R. Prof. Conduct 4.4(a); (4) Ludescher's refusal to produce G.N.'s file upon termination or any of the invoices violated Minn. R. Prof. Conduct 1.16(d) and 8.4(d); (5) Ludescher's choice to sue G.N. for fees that G.N.'s conservator was willing to pay "had no basis in law or fact; demonstrated a lack of legal knowledge, skill necessary for representation; and was conduct prejudicial to the administration of justice," violating Minn. R. Prof. Conduct 1.1, 3.1, and 8.4(d); (5) Ludescher's continued billing of G.N. without court authorization amounted to the charging of an unreasonable fee in violation of Minn. R. Prof. Conduct 1.5(a); and (6) Ludescher's failure to withdraw from representing G.N. violated Minn. R. Prof. Conduct 1.16(a)(3).

The referee found several aggravating factors: (1) G.N.'s vulnerability; (2) Ludescher's substantial experience in both CHIPS and guardianship/conservatorship cases; (3) Ludescher's history of prior discipline; (4) Ludescher's knowingly false statement during the disciplinary hearing; and (5) Ludescher's lack of recognition or remorse for his misconduct. The referee found no mitigating factors. The referee recommended a 30-day suspension.

## ANALYSIS

Ludescher timely ordered a transcript, so the referee's findings of fact and conclusions are not binding. Rule 14(e), Rules on Lawyers Professional Responsibility (RLPR). We nevertheless extend "great deference" to the referee's findings and

13

conclusions. *In re MacDonald*, 906 N.W.2d 238, 243 (Minn. 2018) (citation omitted) (internal quotation marks omitted). "We review the referee's findings of fact and application of the Minnesota Rules of Professional Conduct to the facts of the case for clear error." *In re Nielson*, 977 N.W.2d 599, 608 (Minn. 2022). "A referee's findings are clearly erroneous when they leave us with the definite and firm conviction that a mistake has been made." *Id.* (citation omitted) (internal quotation marks omitted). We "review de novo the referee's interpretation of the Rules of Professional Conduct and other conclusions of law that do not rely on the referee's factual findings." *In re Laver*, 984 N.W.2d 556, 565 (Minn. 2023) (citing *In re Montez*, 812 N.W.2d 58, 66 (Minn. 2012)).

Ludescher argues the referee made three errors of law that resulted in incorrect rule-violation conclusions. Specifically, he argues the referee erred by (1) concluding that the juvenile court's custody-granting orders were unenforceable, (2) concluding that Minn. Stat. § 524.5-417 did not apply to Ludescher's representation of G.N., and (3) misinterpreting Minn. R. Prof. Conduct. 1.6 in concluding that Ludescher's failure to provide G.N.'s file violated the rules of professional conduct. We address each argument in turn—as well as Ludescher's arguments against the referee's findings and conclusions— and then address the appropriate discipline for Ludescher's misconduct.

I.

We first address Ludescher's argument regarding the juvenile court's orders in the J.K. matter. Ludescher argues that his actions were made with the support of valid juvenile court orders granting J.K. temporary custody of the child. Ludescher first asks us to determine that the referee improperly found that the juvenile court's orders were

14

unenforceable. If this court does so, Ludescher's remaining arguments are best understood as claiming that his actions cannot constitute rule violations because he acted with the support of valid court orders. Because Ludescher's arguments that he did not violate any rules of professional conduct rely on his assumption that the referee made a legal error, we will first review Ludescher's arguments about the enforceability of the juvenile court's orders before turning to a review of the referee's rule-violation conclusions.

A.

We begin by describing the legal backdrop in CHIPS cases. Unmarried mothers have sole legal and physical custody of their children born outside of marriage under Minn. Stat. § 257.541, subd. 1. (2022). If a court adjudicates a child as CHIPS, the court may place the child with a non-custodial father under Minn. Stat. § 260C.201, subd. 1(a)(1)(i) (2022). Minnesota law, however, specifically states that such an order placing a child with a non-custodial father "does not confer legal custody [of the child] on that parent." *Id.* After a CHIPS adjudication, Minn. Stat. § 260C.201, subd. 1(a)(2) (2022) only grants the court two choices for transferring legal custody of the child—custody can be transferred to a child-placing agency or to the responsible social services agency.

The referee determined that "[t]he juvenile court's order conferring temporary legal custody to JK is unsupported by Minnesota law because the juvenile court could not have transferred legal custody to JK as a disposition." The referee also found that the testimony of Ludescher's expert witness that the juvenile court's orders were valid and enforceable was "not reasonable" and "not persuasive or credible" given the CHIPS laws and the court of appeals opinion associated with this case, *see In re Children of S.E.M.*, No. A18-0177,

15

2018 WL 2407268, *1 n.2 (Minn. App. May 29, 2018) (holding that even though the juvenile court in this case "ordered that the child 'remain in the temporary physical and legal custody of father,' " the agency, "not a noncustodial parent, has legal responsibility for a child 'taken into custody' and placed with a noncustodial parent under the CHIPS statute").

Ludescher argues that it is a "fundamental and perfunctory" concept that "[a] court order is a court order," and claims the *Rooker-Feldman* doctrine supports his contention. Ludescher also seems to point to the result of the referee's decision as support for his legal argument because Ludescher believes the result of this interpretation "obligates attorneys to challenge the validity of a court order to the detriment of their own client's interests if the legal reasoning or outcome may be later deemed flawed."

Ludescher provided no caselaw that supports his argument that an "order is an order" and therefore is always enforceable without any caveats, likely because supporting authority does not exist[5]. The most apt caselaw is that surrounding the liability imputed on sheriffs who process court orders. In *Robinette v. Price*, 8 N.W.2d 800, 806 (Minn. 1943), we held that, "[a] sheriff, being neither permitted nor required to inquire into the validity of an order placed in his hands for execution, is protected by the order even though the proceedings in which it was issued are erroneous and voidable." The *Robinette* holding

---

[5]     Our decision in this case should not be misconstrued to undermine the basic principle that court orders are enforceable until held otherwise. *See* Minn. R. Civ. App. P. 108.01, subd. 1. Rather, our decision recognizes an attorney's duty of candor to the court, and holds that this duty requires an attorney to inform the court if he knows its order contains a blatant legal error and not to take advantage of an erroneous court order.

could be seen as suggesting that when someone acts with the support of a seemingly-valid court order and it is not their job to assess the validity of the order, then they cannot be penalized for complying with the order.

But Ludescher's circumstances are inherently different than that of the sheriff in *Robinette* because Ludescher is an attorney. Ludescher's job *is*, in part, to assess the validity of the order: he must competently interpret and apply the law, and he is required by the rules of professional conduct to be honest and forthright with the court in making arguments. *See* Minn. R. Prof. Conduct 1.1, 3.3. Ludescher testified in the disciplinary hearing that he knew the child's placement with J.K. did not automatically grant custody on the noncustodial parent. His own testimony shows he knew the juvenile court's orders were unsupported by the law. Thus, Ludescher had an ethical obligation not to improperly leverage or take affirmative action based on the loose language of an order that was contrary to governing law. This obligation did not require Ludescher to act against his client, but it did require Ludescher to inform the court of the error in the order, refrain from the following improper acts: initiating a separate paternity and custody action for J.K. in family court, filing a motion to dismiss the CHIPS petition in relation to J.K.'s child on the grounds that J.K. had been granted temporary legal custody, sending a letter to the Rice County Attorney and sheriff referencing the erroneous court order and alleging that Nelson may have engaged in intentional criminal deprivation of parental rights, and filing a motion for ex parte relief for the return of custody to J.K. Ludescher used the loose language of the court order as the basis for filing multiple custody actions and to accuse opposing counsel, Nelson, of a criminal offense; these actions show he affirmatively and improperly

leveraged the juvenile court's order while knowing the order was contrary to governing law.

We next turn to Ludescher's *Rooker-Feldman* argument. We have explained that the *Rooker-Feldman* doctrine "prohibits federal district courts from exercising subject-matter jurisdiction over claims seeking relief that would, in essence, vacate a state court judgment, because only the United States Supreme Court may review such judgments." *In re Nora*, 942 N.W.2d 127, 130 n.2 (Minn. 2019). Ludescher's argument is that the referee does not have the power to determine that the juvenile court's orders were unenforceable. There is no caselaw applying the *Rooker-Feldman* doctrine in this way. Moreover, we find application of the *Rooker-Feldman* doctrine inappropriate here because the juvenile court itself deemed these orders unenforceable in its May 7, 2018, order. The court of appeals also undermined the validity of the juvenile court's orders in its May 2018 opinion, *S.E.M.*, 2018 WL 2407268, at *1 n.2. These decisions were both made in May 2018—over 4 years before the referee in these proceedings determined that the orders were unenforceable. The *Rooker-Feldman* doctrine does not apply here because the referee simply reiterated the conclusion of both the juvenile court and the court of appeals that these orders were unenforceable.

Lastly, we note that Ludescher's argument that "an order is an order" is factually disingenuous given the language in the juvenile court's orders. The first order issued by the juvenile court on September 13, 2017, stated that the child "shall remain in the temporary legal and physical custody of . . . [J.K.] subject to the protective supervision of" the agency. After this order, Ludescher moved to dismiss the CHIPS petition as it related

18

to J.K., arguing that the petition should be dismissed because J.K.'s conduct was not in question in the CHIPS proceedings and "the court granted temporary custody to [J.K.]," so the child no longer needed protection.

On October 20, 2017, the juvenile court denied Ludescher's motion, explaining that the child was in "temporary physical and legal custody" of J.K. and "subject to the protective supervision" of the agency, and confirmed that J.K. "does not have any court-ordered custodial rights or parenting time." When the juvenile court summarized Ludescher's custody argument, it stated that the argument was based on a custody agreement that J.K. and the mother had reached. The juvenile court concluded that the mother was the custodial parent of the child, so the goal of the CHIPS proceedings was to reunify the child with the mother, not J.K. In other words, it became clear in this October 20, 2017, order that the juvenile court did not understand Ludescher's custody argument to be based on the temporary grant of custody in the juvenile court's earlier order. And the juvenile court clearly articulated that J.K. had no custodial rights to the child outside of the temporary grant in the CHIPS proceedings. The juvenile court continuously reiterated that J.K. had no custodial rights outside the temporary grant in later orders throughout the CHIPS proceedings. The juvenile court also ordered on March 15, 2018, that the agency "shall have the authority to begin a trial home visit with the Mother if/when she obtains safe housing for the Children."

Accordingly, Ludescher's argument that "an order is an order" fails upon considering what the juvenile court's orders made clear: (1) J.K. did not have any lasting custodial rights to the child; (2) the juvenile court did not intend to confer any permanent

19

custody on J.K.; (3) the mother remained the only custodial parent; (4) the purpose of the CHIPS proceeding was to reunify the mother and the child; and (5) the agency had authority to start trial home visits with the mother. All of these points clearly undermine Ludescher's arguments that the juvenile court's order conferred custody of the child on J.K. These points also undermine Ludescher's argument that "an order is an order" because he clearly disregarded these portions of the orders in making his repeated custody arguments. Ludesher's argument, then, seems to be that "an order is an order" only as to the portions that are favorable to his client—but all unfavorable portions of the order are not enforceable.

In sum, Ludescher's actions with respect to the order are not protected by *Robinette*; the *Rooker-Feldman* doctrine does not apply; the record shows that the juvenile court did not intend to confer custody of the child on J.K.; and Ludescher knew that conferring custody on J.K. was not a lawful CHIPS disposition. Consequently, the referee did not make an error of law in concluding that the portions of the juvenile court's orders purporting to give J.K. custody of the child were unenforceable.

B.

We next turn to Ludescher's arguments regarding the referee's rule-violation conclusions in the J.K. matter. Ludescher's arguments on the referee's rule-violation conclusions relating to this matter are based on his assumption that he acted under the authority of a valid court order, or that his repeated custody arguments were good faith arguments aimed at expanding or modifying the law and are therefore protected from disciplinary action under Minnesota Rule of Professional Conduct 3.1. As explained

20

above, the juvenile court's orders did not validly confer custody. Moreso, we do not find Ludescher's argument that he made good faith arguments to expand the law compelling given that the referee found that Ludescher knew "a parent who is labeled as a participant to a CHIPS proceeding does not have legal custody of a child who is the subject of a CHIPS petition" and that "a non-custodial parent could not be given legal custody of a child as a disposition during a CHIPS proceeding because the CHIPS disposition statute only permits legal custody to be transferred to a child placing agency or the county's social services agency." Ludescher does not challenge these findings, and the record does not support that the judge or opposing counsel in the CHIPS matter understood Ludescher's custody argument to be a good faith attempt to modify the existing and well-established law. Consequently, we do not find Ludescher's claim that he acted in good faith to modify existing law to be compelling. A good faith effort to modify the law did not require Ludescher to accuse Nelson of the crime of depriving parental rights, nor did it require Ludescher's unprofessional and bullying behavior. Ludescher's actions do not indicate good faith.

Based on our finding of no legal error in the referee's conclusions on the unenforceability of the juvenile court's orders, our conclusion that Ludescher did not act in good faith to modify existing law, and Ludescher's failure to support his rule-violation arguments with any additional support or challenges to the referee's findings that underly these rule-violation conclusions, we decline to review the referee's rule-violation conclusions.

## II.

Next, we address Ludescher's argument that ARI's termination of his legal representation of G.N. was not valid because ARI did not follow the procedure laid out in Minn. Stat. § 524.5-417 (2022). Ludescher argues that his representation and billing of G.N. after this purported termination was therefore done under a still-existing attorney-client relationship and, so, could not have constituted violations of the Minnesota Rules of Professional Conduct. Again, because Ludescher's arguments that he did not violate the rules of professional conduct rely on his assumption that the referee made a legal error, we will first review Ludescher's arguments about the applicability of section 524.5-417 to the termination of his attorney-client relationship with G.N. before turning to a review of the referee's rule-violation conclusions.

## A.

Ludescher argues that the referee incorrectly interpreted section 524.5-417(e) because the statute's plain language required ARI to petition for a court order to invalidate the attorney-client relationship, and because G.N. had retained Ludescher in the months before he was declared incapacitated.

In July 2018, Braden, ARI's attorney, terminated Ludescher's legal representation of G.N. via letter and requested G.N.'s file. Ludescher continued to provide G.N. legal services after this termination and did not send Braden G.N.'s file. On August 17, 2018, Ludescher appeared at a hearing in the estate case to contest his discharge. The probate court took the issue under advisement and gave Ludescher the chance to file a brief on the issue; Ludescher never filed a brief. The probate court, in a November 2018 order,

22

determined that ARI was G.N.'s guardian and conservator, would act as G.N.'s substitute decision maker in the estate case, and named Braden as the proper attorney of record. The probate court took "judicial notice" of the prior order "establishing that ARI, as [G.N.'s] Guardian and Conservator, is his substitute decision maker with power to approve or withhold approval of any contracts, and establishing J. Scott Braden as their attorney in the present matter." The probate court explained that "[t]his had the effect of legally validating ARI's authority, through attorney Braden, to terminate Mr. Ludescher's contract to represent [G.N.], which ARI did by letter on July 12, 2018." Finally, the probate court stated that "Ludescher never submitted a brief in support of his position" and, consequently, found the issue moot moving forward. Ludescher argued about section 524.5-417(e)'s applicability for the first time in these disciplinary proceedings.

The first letter of conservatorship granted the conservator all powers within Minn. Stat. § 524.5-313(c), and the second granted the conservator the powers in Minn. Stat. § 524.5-417(c)(1)-(6). This includes "the power to approve or withhold approval of any contract, except for necessities, which the person subject to conservatorship may make or wish to make." *Id.* § 524.5-417(c)(5). It also includes "the duty to pay out of the estate of the person subject to conservatorship all lawful debts of the person subject to conservatorship." *Id.* § 524.5-417(c)(2).

Ludescher argues that irrespective of ARI's powers as a conservator under section 524.5-417(c), the conservator was required under section 524.5-417(e) to petition the court to terminate Ludescher's representation of G.N. Section 524.5-417(e) states:

Transaction set aside. If a person subject to conservatorship has made a financial transaction or gift or entered into a contract during the two-year period before establishment of the conservatorship, the conservator may petition for court review of the transaction, gift, or contract. If the court finds that the person subject to conservatorship was incapacitated or subject to duress, coercion, or undue influence when the transaction, gift, or contract was made, the court may declare the transaction, gift, or contract void except as against a bona fide transferee for value and order reimbursement or other appropriate relief. This paragraph does not affect any other right or remedy that may be available to the person subject to conservatorship with respect to the transaction, gift, or contract.

Minn. Stat. § 524.5-417(e).

Braden and Jill Sauber (Ludescher's expert) also testified about how section 524.5-417(e) works. Braden explained that section 524.5-417(e) is usually used for procedures like selling a house or land, entering a cell phone contract, or significant gifts. In those cases, section 524.5-417(e) is "a two-year period of time where [conservators] try to get [a conservatee's] money back." Braden testified that the decision to terminate Ludescher's representation was not about setting aside a transaction for which they would attempt to recoup money, instead it was a termination of Ludescher's ongoing or future representation. Braden also testified that even if there were something about Ludscher's relationship with G.N. that needed to be set aside through section 524.5-417(e), ARI and Braden could not determine that without G.N.'s file and Ludescher's invoices, which Ludescher repeatedly refused to provide.

Sauber testified that section 524.5-417(e) applies to any contract the conservator believed was the result of duress, coercion, or undue influence and requires the conservator to "actually present evidence that the person was subject to duress, coercion, or undue influence, or was in fact incapacitated at that time." She explained that the difference

24

between sections 524.5-417(e) and (c)(5) is "temporal in nature," so you look at the date the conservator was appointed and "[a]ny transactions going forward from that point in time are subject to the withholding or approval of the conservator. Anything going back in time, if the conservator wants to set aside or void a transaction, must fall into [section 524.5-417(e)] and the conservator must follow th[ose] procedures." Sauber also testified that Braden did not have the ability to unilaterally cancel Ludescher's representation of G.N. based on section 524.5-417(e).

The referee "did not find [Sauber's] expert[] testimony" on section 524.5-417(e) and its applicability to Ludescher's circumstances to be "persuasive given the broad powers of a conservator needed to protect the assets of the conservatee, the explicit language of the statute, and the testimony of Mr. Braden regarding the workings of the professional conservator under the law." The referee found that Ludescher never asked ARI or Braden to follow the statutory process in section 524.5-417(e) to terminate Ludescher's representation, and even if he had made such a request, Ludescher's "failure to provide his retainer agreement and the invoices would have made it difficult, if not impossible, for ARI to seek a transaction set-aside" under section 524.5-417(e). Regardless, the referee found that Braden and ARI were not required to use section 524.5-417(e) to prevent Ludescher from continuing to act as G.N.'s attorney because the powers of conservatorship given to ARI included the ability to initiate or terminate any representation on behalf of G.N.

While Ludescher argues that the language of section 524.5-417(e) plainly applies to attorney-client relationships, there is no caselaw in Minnesota that applies that statute to attorney-client relationships. The only authoritative caselaw Ludescher cites to is *Hagen*

25

*v. Rekow*, in which this court held that a guardian of an estate "does not become the alter ego of the incompetent and is not empowered . . . to change an act performed by the incompetent while mentally normal." 91 N.W.2d 768, 771 (Minn. 1958). This court then listed examples from prior caselaw where a guardian made changes to the ward's savings account in trust for another person, changed the beneficiary of the ward's life insurance policy, or waived a ward's rights. *Id.* In *Lawler v. Dunn*, however, this court explained that "[t]he right of a client to discharge his attorney at his election, with or without cause, is universally recognized by the authorities." 176 N.W. 989, 990 (Minn. 1920). This court explained that if a client can terminate the attorney-client relationship at any time without cause, and if a client has this right "as an implied condition of the contract under the law, it follows as a natural consequence that he cannot be compelled to pay damages for exercising that right which his contract gives him." *Id.* The court held that the attorney retains the right to recover the reasonable value of the services rendered, but the client's discharge of the attorney does not constitute a breach of contract. *Id.*

By its terms, section 524.5-417(e) applies when a conservator seeks to void a contract or transaction the conservatee entered into before the conservatorship started if that contract or transaction was entered into under duress or coercion. *See* Minn. Stat. § 524.5-417(e). This provision allows the conservator to protect the conservatee's financial assets if a transaction/contract was entered under duress before the conservatee was declared incapacitated. Given that an attorney-client relationship is terminable at any time without penalty to a client and that ARI and Braden did not seek to undo any actions taken in Ludescher's pre-conservatorship legal representation, but instead sought merely

26

to choose different representation going forward, section 524.5-417(e) did not apply to Ludescher's ongoing attorney-client relationship with G.N. The testimony from Sauber and Braden is also consistent with this conclusion because ARI did not seek to recoup funds already paid or earned by Ludescher. Instead, ARI sought to terminate the relationship going forward and sought G.N.'s file and invoices from Ludescher so that it could perform its fiduciary duty and pay Ludescher for his pre-conservatorship services. Consequently, we conclude the referee did not err by concluding that section 524.5-417(e) did not apply to ARI's termination of Ludescher's ongoing legal representation of G.N.

B.

We next turn to Ludescher's arguments regarding the referee's rule-violation conclusions in the G.N. matter. Again, Ludescher's arguments on the referee's rule-violation conclusions are based on his assumption that section 524.5-417(e) should have applied to ARI's termination of his attorney-client relationship with G.N., and that he had an ongoing attorney-client relationship with G.N. As we have explained, we disagree with this contention and instead conclude that the referee properly determined that section 524.5-417(e) was not applicable. Because we find no legal error in the referee's conclusions on the applicability of section 524.5-417(e) and Ludescher does not support his rule-violation arguments with additional support and does not challenge the referee's

underlying factual findings, we find it unnecessary to review the referee's rule-violation

conclusions.[6]

---

[6]     Although unnecessary, we do briefly address the rule-violation findings. We review the referee's application of the Minnesota Rules of Professional Conduct to facts for clear error. *In re Aitkin*, 787 N.W.2d 152,158 (Minn. 2010). When we are left with a definite and firm conviction that a mistake was made, the clearly erroneous standard is satisfied. *In re Bonner*, 896 N.W.2d 98, 105 (Minn. 2017). The referee found that Ludescher's failure to produce G.N.'s file to ARI after termination violated Minn. R. Prof. Conduct 1.16(d) and 8.4(d). Rule 1.16(d) states that after termination "a lawyer shall take steps to the extent reasonably practicable to protect a client's interests," which includes "giving reasonable notice to the client, allowing time for employment of other counsel, [and] surrendering papers and property to which the client is entitled." Rule 8.4(d) states that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." As the referee found, and Ludescher did not contest, Ludescher's actions in failing to produce the file and invoices "impaired ARI's ability to act as guardian and conservator for GN"; these actions required ARI to "take additional measures to protect GN's interests," which ultimately cost G.N. money that he would not have otherwise incurred had [Ludescher] complied with ARI's requests. Ludescher's actions also "resulted in unnecessary litigation as each of the motions seeking confirmation of ARI's decision-making authority and Respondent's files would not have been needed." These findings are supported by Braden's testimony. Consequently, the referee's rule-violations conclusion was not clearly erroneous.

The referee concluded Ludescher's "conduct in suing an incapacitated client for attorney's fees – when a conservator was available and willing to pay the fees, subject to performing its court-ordered fiduciary duties" – violated Minn. R. Prof. Conduct 1.1, 3.1, and 8.4(d) because his actions "had no basis in law or fact; demonstrated a lack of legal knowledge, skill necessary for representation; and was conduct prejudicial to the administration of justice." Rule 1.1 requires lawyers to "provide competent representation to a client," which includes "the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." Rule 3.1 states that lawyers "shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous." Rule 8.4(d) states that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." As the referee found and Ludescher did not contest, ARI was willing to pay Ludescher's bills if they were supported by the invoices, and Ludescher tried to circumvent ARI's fiduciary duty to G.N. by filing a conciliation action against G.N. Ludescher tried to contravene the conservatorship process, meant to protect G.N.'s estate and assets. Had Ludescher simply provided ARI with the invoices for his bills, there would have been no

### III.

Next, we address Ludescher's arguments that the referee misinterpreted Minnesota Rule of Professional Conduct 1.6(a) by rejecting his argument that the rule permits but does not require disclosure of a client's file under court order. Ludescher claims that this misinterpretation led to unsupported rule-violation conclusions. Because Ludescher's arguments about whether he violated the various rules of professional conduct rely on his assumption that the referee misinterpreted Rule 1.6(a), we first review Ludescher's arguments about Rule 1.6(a) before turning to a review of the referee's rule-violation conclusions.

---

reason for Ludescher to sue G.N. in conciliation court. Consequently, the referee's rule-violation conclusion was not clearly erroneous.

Next the referee concluded that Ludescher's "conduct in continuing to bill an incapacitated GN absent court authorization, amounted to an unreasonable fee" violating Minn. R. Prof. Conduct 1.5(a). Rule 1.5(a) states that "[a] lawyer shall not . . . charge, or collect an unreasonable fee or an unreasonable amount for expenses" and lists a number of criteria to be used in determining if a fee is valid. Clear in the plain language of the rule and the comments is that these fees are charged to clients. Ludescher did not have an ongoing attorney client relationship with G.N. after ARI terminated Ludescher on July 12, 2018. But the referee found, and Ludescher does not contest, that he charged G.N. "$3,160 in legal fees and $165.85 in total expenses between July 12, 2018, and October 19, 2019, including all fees associated with the conciliation court case filed against GN" Meaning, Ludescher charged G.N. for fees when they did not have an ongoing attorney client relationship, and charged G.N. for fees accrued while Ludescher was suing G.N. Consequently, the referee's rule-violation conclusion was not clearly erroneous.

Finally, the referee found that Ludescher's failure "to withdraw from representing GN after he was discharged by ARI violated [Minn. R. Prof. Conduct] 1.16(a)(3)." Rule 1.16(a)(3) states that a lawyer "shall withdraw from the representation of a client if . . . the lawyer is discharged." Given that section 524.5-417(e) did not apply and Ludescher's contract was terminated on July 12, 2018, the probate court ordered that Ludescher could no longer represent G.N. in the estate case, and there is no dispute that Ludescher never filed a withdrawal, the referee's rule-violation conclusion was not clearly erroneous.

29

The referee found that Ludescher's claim that he was prohibited from providing G.N.'s information was "not persuasive." The referee explained that Rule 1.6(b) "permits a lawyer to reveal information related to a client if 'the lawyer reasonably believes the disclosure is necessary to comply with other law or a court order,' " and Ludescher "was explicitly directed by the court to provide his file and invoices" and "any reasonable attorney would have understood the disclosure was necessary to comply with the court's order." Because Ludescher "was court-ordered to provide the information," the referee determined that Ludescher could not "use Rule 1.6, MRPC, as an excuse not to comply with the court's order." Ludescher argues the referee misinterpreted the plain language in Rule 1.6(a) by rejecting the argument that Rule 1.6(a) prevented Ludescher from disclosing his client's information. Ludescher contends that Rule 1.6 allows for permissive disclosure of a client's file when under a court order but does not require disclosure. Ludescher, however, does not support his arguments with any legal citation other than his citations to the rule, so we decline to review this argument as it is forfeited. *In re McCloud*, 955 N.W.2d 270, 280 n.12 (Minn. 2021) (deeming an argument forfeited because the attorney provided "no argument or citation to authority supporting this conclusion").[7]

---

[7] We also note the logical infirmity of this argument—the referee did not find that Ludescher violated Rule 1.6. Instead, the referee found that Ludescher violated rule 1.16(d) by failing to disclose G.N.'s file, which the conservator (who acted as G.N.) was entitled to have. Ludescher is attempting to use Rule 1.6 as a shield against his obligation to disclose the file in Rule 1.16(d). For this to work, Rule 1.6 would have to *prohibit* a disclosure of a file in this instance, which it does not do by its plain language because of the applicability of Rule 1.6(b)(9) (permitting disclosure if "the lawyer reasonably believes the disclosure is necessary to comply with other law or a court order"). Consequently, it is irrelevant whether Rule 1.6 requires disclosure so long as it permits disclosure.

30

As Ludescher's arguments about the validity of the referee's rule-violation conclusions are based on his assumption that the referee misinterpreted Rule 1.6, we decline to review the referee's rule-violation conclusions because the condition precedent Ludescher gave for these arguments—the referee's supposed misinterpretation of Rule 1.6—has been forfeited.

IV.

Finally, we consider the appropriate discipline for Ludescher's misconduct. The referee recommended a 30-day suspension but noted that none of the disciplinary cases cited by the parties "appear[ed] to fit well with the misconduct found [in Ludescher's case], and so the recommended sanction of suspension reflects deference to the Supreme Court in establishing the appropriate sanction." The Director argues that a 60-day suspension and probation term would be more consistent with the purposes of discipline given the nature of the misconduct, the vulnerability of the clients, and the presence of multiple aggravating factors. Ludescher argues that no suspension is warranted, but alternatively argues that a 60-day suspension is unwarranted given how easily distinguished Ludescher's case is from other 60-day discipline cases.

Although we give great weight to the referee's recommendation for discipline, we retain the "ultimate responsibility for determining appropriate discipline." *In re Montez*, 812 N.W.2d 58, 66 (Minn. 2012). The purpose of disciplinary sanctions is to protect the public and judicial system and to deter future misconduct by attorneys—not to punish the attorney. *In re Vaught*, 693 N.W.2d 886, 890 (Minn. 2005). We consider four factors when imposing discipline: (1) the nature of the misconduct; (2) the cumulative weight of

31

the disciplinary violation; (3) the harm to the public; and (4) the harm to the legal profession. *In re Butler*, 960 N.W.2d 540, 552 (Minn. 2021). We also consider aggravating and mitigating factors. *Id.* Finally, while we consult similar cases and attempt to impose consistent discipline, the proper discipline is ultimately determined "based on the unique facts and circumstances of each case." *In re Matson*, 889 N.W.2d 17, 25 (Minn. 2017) (citation omitted) (internal quotation marks omitted).

## A.

We begin with the nature of Ludescher's misconduct. Ludescher's misconduct included making knowingly false statements, which we have stated "demonstrates a lack of honesty and integrity, and warrants severe discipline." *In re Lundeen*, 811 N.W.2d 602, 606, 608 (Minn. 2012) (citing *In re Ulanowski*, 800 N.W.2d 785, 800 (Minn. 2011) (*Ulanowski I*)). Ludescher charged G.N. unreasonable fees, which we have held warrants suspension, especially when coupled with other misconduct. *See In re Igbanugo*, 863 N.W.2d 751, 760–762 (Minn. 2015). Ludescher's actions in both matters involved bringing frivolous claims, and we have held that "[s]ubmitting frivolous claims is conduct also subject to sanctions. We have held that suspension is appropriate when an attorney files one frivolous, vexatious lawsuit." *Ulanowski I*, 800 N.W.2d at 800.

Ludescher committed misconduct towards Nelson by telling the county attorney and sheriff that she committed a crime, and we have held that "[i]mproperly threatening criminal prosecution and harassing opposing counsel may also subject an attorney to discipline." *Ulanowski I*, 800 N.W.2d at 800-01 (citing to *Nelson*, 733 N.W.2d 458, 461

(Minn. 2007) (noting an attorney had been admonished for improperly threatening "criminal prosecution to coerce payment in a civil matter")).

B.

We next consider the cumulative weight of Ludescher's disciplinary violations. We distinguish between "a brief lapse in judgment or a single, isolated incident and multiple instances of misconduct occurring over a substantial amount of time." *In re Pearson¸* 888 N.W.2d 319, 322 (Minn. 2016) (citation omitted) (internal quotation marks omitted). The referee found Ludescher committed multiple rule violations between 2017 and 2019. Ludescher's actions spanned multiple years, two client matters, and involved repetitive misconduct of the same nature in both client matters. Consequently, Ludescher's misconduct involved multiple instances of misconduct over a substantial amount of time and cannot be characterized as a brief lapse in judgment. *See Capistrant*, 905 N.W.2d 617, 621 (Minn. 2018) (concluding that while misappropriation only occurred once, the misconduct was neither a "brief lapse in judgment" nor a "single, isolated incident" because other misconduct spanned 2 years).

C.

Next, we evaluate the harm that Ludescher's misconduct caused to the public and to the legal profession. The Director contends that Ludescher's actions harmed Nelson and Braden and interfered with ARI's ability to fulfill its duties. The Director also contends that Ludescher's arguments that were contrary to well established law undermined public confidence and wasted judicial resources, that Ludescher's attempt to exploit a court error to benefit his client while knowing it was erroneous harmed the legal profession, and that

33

Ludescher's repeated advocacy of frivolous arguments based on these knowingly false theories harmed the legal profession. Additionally, the Director argues that Ludescher's refusal to comply with court orders and harassing opposing counsel undermined the public trust in the legal system. Ludescher made no argument regarding the harm caused to the legal profession or public.

In assessing harm, we consider how many and to what extent clients were harmed. *In re Coleman*, 793 N.W.2d 296, 308 (Minn. 2011). Ludescher's actions resulted in harm to his clients and others involved in the cases. Ludescher's actions caused Nelson emotional distress given the criminal investigation opened against her and the embarrassment caused to her when Ludescher read her a *Miranda*-esque warning on the record at a proceeding where others were present. Braden also testified that Ludescher's actions had a negative impact on him. Ludescher's actions harmed G.N. by accumulating legal and other fees that were unnecessary. In general, Ludescher's violations of the rules of professional conduct are inherently detrimental to respect for the legal profession and the judicial system as a whole. *See In re Jaeger*, 834 N.W.2d 705, 710–11 (Minn. 2013). Ludescher's false statements to the juvenile court in the J.K. matter undermined public confidence in the legal system. *See In re Sea*, 932 N.W.2d 28, 36 (Minn. 2019). And the referee determined that Ludescher made frivolous claims in both matters, which are a waste of the court's resources. *See In re Albrecht*, 779 N.W.2d 530, 542 (Minn. 2010) (stating that an attorney's neglect caused "the needless expenditure of judicial resources and the resources of opposing counsel, which harmed the legal profession").

34

D.

To determine the appropriate discipline, we also must examine any mitigating and aggravating factors. The referee found no mitigating factors and Ludescher does not contend that any mitigating factors exist. The referee found five aggravating factors: (1) G.N.'s vulnerability, (2) Ludescher's substantial experience in CHIPS and guardianship and conservatorship matters, (3) Ludescher's prior discipline, (4) Ludescher's knowingly false statement at a disciplinary hearing, and (5) Ludescher's lack of remorse.

Our caselaw supports the referee's determination that these factors should aggravate Ludescher's discipline. G.N. was subject to a conservatorship and when "an attorney exhibits callous disregard for the physical and financial well-being of vulnerable, dependent persons, that attorney has a heavy burden to persuade the court [of their] fitness to continue the practice of law." *See In re Harrigan*, 841 N.W.2d 624, 631 (Minn. 2014) (citation omitted) (internal quotation marks omitted); *see also Ulanowski*, 834 N.W.2d 697, 704 (Minn. 2013) (*Ulanowski II*).

We have held that substantial experience practicing law is an aggravating factor. *See In re Tigue*, 900 N.W.2d 424, 432 (Minn. 2017). Ludescher has been a lawyer for over 30 years, which is substantial experience practicing law; he has also practiced in CHIPS matters since 1989 and conservatorship and guardianship matters since 2000, which constitutes substantial experience in the specific areas involved here. *See Ulanowski I*, 800 N.W.2d at 802 (finding 6 years after admission to practice law and 2 years of full-time practice at the time of his first act of misconduct was an aggravating factor).

Prior discipline is an aggravating factor. *See, e.g.*, *Capistrant*, 905 N.W.2d at 619 (finding that previous discipline "weighs heavily" because it was for similar misconduct). Ludescher has two prior admonitions, which included misconduct in representing a client despite having a monetary judgment against that client and without obtaining written informed consent, as well as misconduct in entering into a mortgage transaction with a client and continuing to represent the client without obtaining informed written consent. Although these incidents of prior discipline are an aggravating factor, we do not conclude that these weigh heavily against Ludescher given the lack of severity of the prior discipline and the differences between the prior discipline and Ludescher's current misconduct.

The referee found, and Ludescher does not contest, that he made a knowingly false statement at the disciplinary hearing by "unequivocally" denying that he gave Nelson a *Miranda*-esque warning on the record. We have "recognized that misconduct in the referee hearing may be an aggravating factor." *In re Adams*, 942 N.W.2d 720, 729 (Minn. 2020). We have also held that "[m]aking misrepresentations can be considered an aggravating factor." *Ulanowski I*, 800 N.W.2d at 802. Lastly, we consider an attorney's lack of remorse and failure to appreciate the severity of the misconduct to be aggravating factors. *In re Winter*, 770 N.W.2d 463, 468 (Minn. 2009). Ludescher's false statement at the disciplinary hearing illustrates his lack of remorse and failure to appreciate the severity of his misconduct.

## E.

Finally, we consider similar cases "to ensure that our disciplinary decision is consistent with prior sanctions." *In re Nathanson*, 812 N.W.2d 70, 80 (Minn. 2012). The parties analogize using three cases: *In re MacDonald*, 906 N.W.2d 238 (Minn. 2018); *In re Torgerson*, 870 N.W.2d 602 (Minn. 2015); and *In re Graham*, 453 N.W.2d 313 (Minn. 1990). Ludescher generally argues that these cases are dissimilar to his case, while the Director argues they are similar. Although these prior decisions do have certain similarities to this case, we agree with both Ludescher and the referee that none of these cases provide particularly strong guidance as to the appropriate discipline here.

In *MacDonald*, the attorney harmed two clients by making recklessly false statements about a judge, disrupting court proceedings, taking photographs in the court room, and providing incompetent legal representation. 906 N.W.2d at 240–43. The attorney's actions were aggravated by two factors: first, her substantial practice in the area of law; and second, her lack of remorse, lack of insight into the effect of her misconduct, and her blaming of others; there were no mitigating factors. *Id.* at 248–49. This court imposed a 60–day suspension followed by 2 years of probation. *Id.* at 250–51. Ludescher's conduct spanned a similar amount of client matters and encompassed one of the same forms of misconduct. However, Ludescher was not cited for making false statements about a judge, disrupting a court proceeding, or taking photographs in the courtroom. In general, Ludescher's conduct was dissimilar to the conduct in *MacDonald*, and Ludescher's case involves over twice as many aggravating factors as *MacDonald*, including client vulnerability, making a false statement at the disciplinary proceeding, and prior discipline.

37

In *Torgerson*, the attorney committed misconduct in five client matters, as well as misconduct in the course of another attorney's discipline matter. 870 N.W.2d at 606–08. The attorney made false statements; disobeyed a court order; acted belligerently toward a judge and court staff; engaged in conduct prejudicial to the administration of justice; and used a retainer agreement that required a client to pay a nonrefundable flat fee. *Id.* The attorney's actions were aggravated by substantial experience in the practice of law and failure to recognize the wrongfulness of their conduct. *Id.* at 613–14. The attorney's actions were mitigated by the fact that others may have provoked her to make the statements underlying some of her misconduct. *Id.* at 614. This court issued a 60–day suspension. *Id.* at 616. Overall, the misconduct in *Torgerson* is somewhat similar to the misconduct here, except that more clients were involved in *Torgerson*. But Ludescher's case involves more aggravating factors—client vulnerability, making a false statement at a disciplinary hearing, and prior discipline—and no mitigating factors.

In *Graham*, the attorney engaged in misconduct by making false statements about a judge, county attorney, magistrate, and another attorney. 453 N.W.2d at 319. The attorney's actions were aggravated by continued misconduct in the disciplinary proceedings, and additional frivolous legal petitions to remove the Director from the case and from office. *Id.* at 325. The court also mentioned that the attorney's attitude was problematic as it resembled a choice to believe that a conspiracy existed against him and find fault with others rather than himself. *Id.* While *Graham* does not seem to involve harm to any clients, the attorney's conduct is more involved but similar to Ludescher's actions toward Nelson. The attorney in *Graham*, however, committed many more

38

instances of this misconduct in a more public setting. On the other hand, we also note that Ludescher's case involves more aggravating factors, namely lack of remorse, client vulnerability, substantial experience, and prior discipline. Even so, the overall conduct in *Graham* is dissimilar to most of the misconduct at issue in Ludescher's case.

A review and comparison of these cases to Ludescher's circumstances shows the existence of more aggravating factors in Ludescher's case, and sometimes more voluminous misconduct. Consequently, we concur with the referee that a suspension is appropriate based on the facts and circumstances of this case. But based on the significant aggravating factors present here, and in light of the nature and extent of Ludescher's misconduct, we conclude that the appropriate discipline is a 60-day suspension from the practice of law followed by a 2-year term of unsupervised probation.

Accordingly, we order that:

1.      Respondent David L. Ludescher is suspended from the practice of law, effective 14 days from the date of this opinion, for a minimum of 60 days.

2.      Respondent shall comply with Rule 26, RLPR (requiring notice of suspension to clients, opposing counsel, and tribunals), and shall pay $900 in costs pursuant to Rule 24, RLPR.

3.      Respondent shall be eligible for reinstatement to the practice of law following the expiration of the suspension provided that, not less than 15 days before the end of the suspension period, respondent files with the Clerk of Appellate Courts and serves upon the Director an affidavit establishing that he is current in continuing legal education

requirements; has complied with Rules 24 and 26, RLPR; and has complied with any other conditions for reinstatement imposed by the court.

4. Within 1 year of the date of this opinion, respondent shall file with the Clerk of the Appellate Courts and serve upon the Director proof of successful completion of the written examination required for admission to the practice of law by the Minnesota State Board of Law Examiners on the subject of professional responsibility. See Rule 4.A.(5), Rules for Admission to the Bar (requiring evidence that an applicant has successfully completed the Multistate Professional Responsibility Examination). Failure to timely file the required documentation shall result in automatic suspension, as provided in Rule 18(e)(3), RLPR.

5. Upon reinstatement to the practice of law, respondent shall be placed on supervised probation for 2 years, subject to the following conditions:

a. Respondent shall abide by the Minnesota Rules of Professional Conduct.

b. Respondent shall cooperate fully with the Director's Office in its efforts to monitor compliance with this probation. Respondent shall promptly respond to the Director's correspondence by its due date. Respondent shall provide to the Director a current mailing address and shall immediately notify the Director of any change of address. Respondent shall cooperate with the Director's investigation of any allegations of unprofessional conduct that may come to the Director's attention. Upon the Director's request, respondent shall provide

authorization for release of information and documentation to verify compliance with the terms of this probation.

MOORE, III, J., took no part in the consideration or decision of this case.

PROCACCINI, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.